## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

PATRICK J. QUINN,

     Defendant.

Case No. 1:19-CR-10467-RGS

### SENTENCING MEMORANDUM OF DEFENDANT PATRICK QUINN

Patrick Quinn is a disabled veteran of the United States Marine Corps. Friends and family describe him as a kind and devoted father to his son Brian who suffers from severe autism, among other disorders, and requires assistance with all aspects of daily life. As the letters explain, Brian is Patrick's "number one" priority and "purpose for living." Patrick and his ex-wife Amy constantly work together to manage Brian's conditions and frequent outbursts, which is especially difficult now that he is seventeen years old.

Patrick was convicted after a jury trial and the Court's remaining question is what punishment is sufficient, but not greater than necessary to meet the goals of sentencing. Because Patrick is essential to Brian's care and suffers from his own complex health issues, which are best managed by his current team of doctors, Patrick respectfully requests that the Court impose a sentence of probation with a period of home confinement, plus a fine in the Sentencing Guideline range of $10,000 to $100,000. Such a sentence will punish Patrick but also allow both him and Brian to receive the essential, irreplaceable medical care they need in the most efficient manner.

## ARGUMENT

The Court is not bound by the Sentencing Guidelines as they are only one factor for its consideration in imposing a sentence. *United States v. Booker*, 543 U.S. 225 (2005). The Court calculates the guideline range and, after arguments by the parties, it "consider[s] all of the § 3553(a) factors to determine whether they support a sentence requested by a party." *United States v. Gall*, 552 U.S. 38, 49-50 (2007). Ultimately, the Court must craft an individualized sentence that is "minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). The Court may vary from the sentencing guidelines based on the § 3553(a) factors, including the characteristics of the defendant. *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (affirming sentence with 91 month downward variance where defendant showed significant potential for rehabilitation). The ultimate sentence must be individualized and must comport with the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

## I. History and Characteristics

### A. Patrick's Early Years and Military Service

Growing up, Patrick's home life was turbulent. Patrick's father, a Vietnam veteran, was violent and physically abused Patrick and his mother. PSR at ¶ 42.[1] His father inflicted both "physical and psychological abuse" on his mother. Ex. A at 3. They divorced when Patrick was two years old. PSR at ¶ 42. As a result, Patrick and his two sisters "grew up in a single mother household where [they] had to heavily rely on each other." Ex. A at 3.

The children's relationship with their father was difficult, especially for Patrick. They "walked on eggshells" around him because he has "mental health issues and has received

---

[1] This Memorandum cites to the Draft Presentence Report.

professional help for these issues for the majority of his life up until present day."  PSR at ¶ 48;
Ex. A at 3.  Beginning around age 12, Patrick's father "somehow" gained custody of him.  Ex. A
at 3.  After a few years, Patrick "harmed himself substantially to escape the same physical and
psychological abuse [his] mother had previously suffered."  *Id*.  Around this time, Patrick was
admitted to Pembroke Hospital for suicidal ideation.  PSR at ¶ 48.  But these warning signs did
not end the abuse for Patrick.  His father physically abused him until he was about 16 years old
and could defend himself. *Id*. at ¶ 42.  Aside from violence, Patrick's family struggled with
poverty.  They often lacked electricity, heat, and/or food.  *Id*. at ¶ 48.  Patrick received free lunch
at school.  *Id*. at ¶ 42.

     In 1991, at the age of 19, Patrick enlisted in the United States Marine Corps.  Trial Tr. Day
5 at 166:24. He was deployed to Okinawa, Japan on three separate occasions in addition to a
training facility in Virginia and the U.S.S. Whidbey Island.  Trial Tr. Day 5 at 168:3-17.  During
his military service, Mr. Quinn experienced two traumatic events.  First, a friend and sergeant in
his unit stepped on a landmine and lost his leg.  Trial Tr. Day 6 at 16:2-13.  Patrick ran to assist
the sergeant who was eventually taken from the scene for medical treatment.  Trial Tr. Day 6 at
16:2-13.  Patrick never learned what happened to him.  Trial Tr. Day 6 at 16:2-13.  Second, a close
friend of Patrick's was participating in a helicopter training activity when the helicopter crashed.
Trial Tr. Day 6 at 16:19-25.  Patrick ran up to the helicopter and found his friend severely wounded
and crying out in pain.  Trial Tr. Day 6 at 16:19-25.  Patrick's friend died in his arms.  Trial Tr.
Day 6 at 16:19-25. In 1995, Patrick was honorably discharged to pursue his education, and he
maintained reserve obligations through 1999.  Trial Tr. Day 5 at 168:22-169:14.  "Being a former
Marine is one [of Patrick's] proudest achievements."  Ex. A at 3.

B.      *Patrick's Attempt to Adjust to Civilian Life*

After his military service ended, Patrick tried to resume a normal life.  He attended the University of Massachusetts at Boston for two semesters.  TX 89.  He transferred to Bentley College in 1996 but he found the curriculum and course load overwhelming and transferred back to UMass.  TX 89.  Soon after, Patrick was failing his classes and dropped out of school.  TX 89.

Patrick's struggles were caused by his extremely severe PTSD.  Trial Tr. Day 6 at 15:10-14.  He was significantly impaired in terms of daily activities, including school, work, and his ability to relate to people.  Trial Tr. Day 6 at 15:20-24.  He had unwanted flashbacks and nightmares related to his friend's death in the helicopter.  Trial Tr. Day 6 at 17:6-18.  He suffered from insomnia, outbursts of anger, and difficulty concentrating.  Trial Tr. Day 6 at 18:16-18.  He had difficulty getting along with other people.  Trial Tr. Day 6 at 18:5-11.

Patrick married Amy Quinn in May 2004.  They had one child, Brian, and divorced in 2016.  PSR ¶ 49.  Patrick had significant medical issues throughout his marriage to Amy including PTSD, OCD, migraines, insomnia, and joint pain that required surgery.  Trial Tr. Day 5 at 66:5-11; 98:20-24.  He saw a psychiatrist for his PTSD who prescribed his anti-psych medication in addition to a neurologist for his migraines, an orthopedist for his knees and shoulders, and a gastroenterologist for other issues.  *Id*. at 99:3-23.

C.      *Patrick's Dedication to Brian, Family, and Friends*

Friends and family most applaud Patrick for his dedication to Brian.  Patrick's "main concern is the wellbeing and welfare of Brian" and he "always puts Brian's needs before his own."  Ex. A at 14.  As Amy explains, "I admire Patrick's commitment as a father; especially given his childhood.  Brian's health, safety, and long-term financial security is his purpose for living.  Patrick has two true loves: Brian and the United States Marine Corps."  *Id*. at 1.  Amy's sister agrees that Patrick "is a good father and is instrumental in raising his son and keeping him safe."  *Id*. at 6.

Patrick's older sister Kelly is "most proud" of Patrick because "he is a loving and extremely devoted father." *Id*. at 3.   He has "maintained an admirable and healthy co-parenting relationship with [Amy]" which "will make a huge difference in Brian's life." *Id*. Patrick's cousin Kimberly, who lived with Patrick and his family for several years, sums up his relationship with Brian well:

> "Brian has always had a certain connection with his father and his behavior completely changes when Patrick is around.   Patrick grounds him, helps him understand the things he is having trouble with, and that makes Brian feel accomplished.   Brian worships his father, and he always has." *Id*. at 7.

Patrick has shown similar dedication to other members of his family.   "[A]t his core, [Patrick] is humble and kind." *Id*. at 2.   He "was there to help take care" of his Grampy, his mother's father, when he was diagnosed with Alzheimer's. *Id*. at 3.   Patrick was also very close with his mother and cared for her when she was ill.   As Kelly recalls:

> "[Y]ears later, when our mother (and her two sisters) came down with early onset Alzheimer's, [Patrick] was there for her as a caretaker.   Long after my mother forgot his name, forgot that he was her son, lost the ability to speak and everyone was a stranger to her, she would still light up at the sight of him.   My brother selflessly cared for her until the end, as she did for us." *Id*.

After reconnecting with his cousin Kimberly, who was only 18 and dealing with the fallout of her mother and her sister's substance abuse, Patrick "took it upon himself to help [her] through it." *Id*. at 7.   The steps Patrick took to help Kimberly were concrete:

> "He furnished his basement and moved me into his home with his wife and newborn child.   He took care of me like I was his own daughter.   He helped me study to get through college, buy a car, he watched me graduate, find my own apartment, and took me on every family vacation yearly with his wife and son."

Patrick's generosity had a profound impact on Kimberly's life:

> "I would not be who I am today if I did not have Patrick in my life.   He made all the chaos disappear.   He showed me what family was about, what marriage was about, how to be successful and to never let anything let you fall.   He truly helped me shape my morals and values as a young woman who didn't have that from her own family." *Id*.

Patrick played a similar role for Erin Gaffney who was a close family friend.  Erin babysat Brian when he was young and later worked at Quinn Group, eventually taking over as operations manager from Amy.  *Id*. at 10.  Patrick made "a lasting impression" on Erin and gave her advice about "life lessons, work decisions and even fatherly advice."  *Id*.  She went through two family situations, with her sister and her father, which she describes as hard for her "to understand and come to terms with."  Patrick played a role in helping her through them: "Patrick was someone I could count on and talk to about these matters.  He really cared about the situations, he really cared about me, he really cared about my family and that's because he is a true family man."  *Id*.

Patrick never forgot his childhood struggles with poverty and tried to help those in similar situations.  He received free lunch tickets at school and that was the "only time he ate" "but his sisters were too embarrassed to use them, so they went hungry."  *Id*. at 2.  Remembering his sisters' embarrassment, "Patrick would hand any extra money he had to [Brian's] teachers to discreetly purchase lunches for any child who couldn't afford it."  *Id*.

Other friends describe similar acts of kindness by Patrick.  A longtime friend, Gale Brady, has known Patrick for over 25 years and describes him as a "reliable confidant."  *Id*. at 14.  She explains, "I have always found him to be trusted and available to guide me with his knowledge and generous with his time to address my concerns and advising me on personal or any matters of concern to me."  *Id*.  Patrick was also kind and generous to Gale's father who was a proud Marine like Patrick.  The two men bonded over their shared love of the Marine Corps and Patrick "would stop by to visit with him in his elder years."  *Id*.  Another longtime friend, Lori Garone, says Patrick "is a man that will pick up the phone any time you call and is quick to lend a hand."  *Id*. at 13.  He "possesses all of the qualities that you would look for in a friend; he is loyal, compassionate, and honest."  *Id*.  Mark Shadley, a friend of Patrick's for approximately 25 years and a local business

owner, describes him as "a top-notch person in every aspect of his life.  He has served his country, has been an excellent customer, advisor and friend to me over many years."  *Id*. at 12.

## II.      Nature of the Offense

After a jury trial, Patrick was convicted of two counts of theft of government money and two counts of making a false statement.  The offenses related to Patrick's receipt of disability benefits from the Department of Veterans Affairs and the Social Security Administration.  The government agreed that Patrick was a veteran of the United States Marine Corps who suffered from significant disabilities.  Because he was a disabled veteran, Patrick qualified for VA and SSA benefits as long as he was not engaged in substantial gainful activity.  The key question for the jury was whether Patrick's limited activities on behalf of Quinn Group Insurance, the company he inherited from his father, exceeded the work limit imposed by VA and SSA regulations.

The evidence showed that Patrick did perform work for Quinn Group, although far from full time.  The Company was largely run by Patrick's wife, Amy, and later by Erin Gaffney.  Trial Tr. Day 5 at 75:13-76:2, 84:12-85:9, 89:12-91:2, 94:25-97:14, 137:4-10, 142:21-143:8, 144:3-17. The largest customers were handled by employee Johanna Moloney.  Trial Tr. Day 4 at 59:14-62:20; Trial Tr. Day 5 at 140:4-11.  Representatives from these customers testified that Patrick did little for their accounts.  Trial Tr. Day 3 at 163:17-164:22; Trial Tr. Day 4 at 17:18-1, 22:13-23:7, 24:1-23. Several witnesses testified that Patrick worked less than five hours per week.  Trial Tr. Day 5 at 86:22-87:10, 146:16-25.

Evidence also showed that Patrick's disabilities limited his ability to work. He frequently went to doctor's appointments.  Trial Tr. Day 5 at 49:4-15.  His recurring migraines often left him unable to work at all.  Trial Tr. Day 5 at 48:24-49:3; 144:8-17.  In 2018, towards the end of the charged time period, Patrick's disabilities worsened.  Following a nightmare about the helicopter

crash, he jumped out of bed, crashed into a piece of furniture, fell to the ground, and severely injured his spinal cord.  Trial Tr. Day 6 at 29:25-30:4. He was hospitalized before returning to the hospital for surgery.  Trial Tr. Day 5 at 107:9-13.  After his release, he was in acute rehab from May 2018 to September 2018.  Trial Tr. Day 5 at 107:23-25. Multiple witnesses testified that he did not work for Quinn Group during the period after the accident.  Trial Tr. Day 5 at 49:16-50:14, 108:5-7.

### III.    Sentencing Guidelines

Patrick and the Government agree on the advisory Sentencing Guidelines range.  Pursuant to USSG § 3D1.2(d), Counts One through Four are grouped for guideline calculation purposes because the offense level is determined largely by the total amount of loss.  The base offense level is 6.  USSG § 2B1.1(a)(2).  An additional 12 levels are added because the offense resulted in a loss of more than $250,000, but less than $550,000.  USSG § 2B1.1(b)(1).  Patrick's total offense level is 18 and he is in criminal history category I.  PSR at ¶ 37.

### IV.    A Substantial Downward Departure is Warranted

The Court should vary downward and impose a non-custodial sentence because Patrick's son, Brian, suffers from severe autism and requires Patrick for his care, and Patrick suffers from several complicated and severe health conditions that are most effectively managed by his current doctors.  In situations like this where there are "sound, case-specific reasons" to do so, a sentencing court is authorized to deviate from the guidelines.  *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).  The sentencing inquiry is "broad, open-ended, and significantly discretionary."  *Id*. at 92.  Here, a sentence of probation, coupled with a period of home confinement and a fine within the guideline range, constitutes a fair and just sentence that is "sufficient, but not more than necessary," to meet the sentencing goals enumerated in § 3553(a).

A.      *Patrick's Son Suffers from Severe Autism*

A downward variance is warranted because Patrick's son Brian suffers from severe autism and Patrick is essential to his care.  Courts in this Circuit have repeatedly acknowledged that a downward variance "for extraordinary family circumstances may be appropriate where the care provided by the defendant is irreplaceable or otherwise extraordinary." *United States v. Roselli*, 366 F.3d 58, 68 (1st Cir. 2004); *see also* U.S.S.G. § 5H1.6.  The court must determine "whether there are feasible alternatives of care that are similar to what the defendant provides." *Id*.  In *Roselli*, the Court departed downward where the defendant had two children with cystic fibrosis that required significant medical care by him and his wife who had no other suitable caretakers besides defendant.  *Id*. at 69-70.  Likewise, in *United States v. Sclamo*, the defendant pled guilty to possession with intent to distribute 9.5 ounces of cocaine.  997 F.2d 970, 971 (1st Cir. 1993).  Because of the defendant's positive relationship with his girlfriend's son, who suffered from ADD and had been abused, the Court varied downward from the government's recommendation of a 28-month sentence to three years' probation with six months home confinement.  *Id*. at 972-973.  The First Circuit affirmed because it was clear that the defendant played a longstanding and important role in the child's treatment.  *Id*. at 974.

Other courts across the country have also varied downward in similar circumstances.  For example, in *United States v. Bortnick*, the defendant was convicted of fraud and related charges and ordered to pay over $7,000,000 in restitution.  2006 WL 680544, at *1-2 (E.D. Pa. Mar. 15, 2006).  The Sentencing Guidelines range was 51 to 63 months.  *Id*. at 4.  The Court ultimately departed downward to seven days in custody and five years' supervised release because defendant's son had a serious medical condition which required constant monitoring.  *Id.* at *1, 5.

It found that even though defendant's wife was also a caretaker for the child, the defendant's contribution to his son's care was important enough to justify the departure. *Id*. at *5.

Similarly, in *United States v. Bailey*, the Court departed downward in a child pornography case from 21 to 27 months' incarceration to one year of home confinement with exceptions for work where defendant's daughter had a serious condition, the defendant's presence was critical to her continued recovery, and the defendant's presence could not be duplicated by others.  369 F. Supp. 2d 1090, 1103 (D. Neb. 2005); *see also United States v. Lehmann*, 513 F.3d 805, 806-807 (8th Cir. 2008) (affirming downward departure from 37 to 46 months' incarceration to probation with community confinement in felon in possession case where defendant's son was struggling after the accidental death of his sister and needed his mother's support).

Brian receives treatment for several serious psychiatric conditions.  Since August 2015, he has been under the care of psychiatrist Gagan Joshi for the management of Autism Spectrum Disorder, Attention-Deficit/Hyperactivity Disorder, Unspecified Anxiety Disorder, and Unspecific Mood Disorder.  Ex. A at 15.  He attends Arlington High School under an IEP program and in a substantially separate classroom, which provides students with social and emotional support in addition to adult living skills.  Ex. A at 1.  Outside of school, "Brian relies solely on [Amy] and Patrick."  Ex. A at 1.  Although Brian is now 17 years old, he cannot complete basic tasks because of his degree of autism.  PSR at ¶ 49.  He does not work, drive, or tie his own shoes. *Id.* at ¶¶ 49-50.  Brian's disabilities require treatment, including visits with his psychiatrist and approximately eight medications.  *Id*.

Brian requires a strict routine and any deviation causes "a range of disruption, from teenage defiance to emotional and physical outbursts."  Ex. A at 1.  For example, Brian "wakes up at 7:00 am and is in bed at 8:00 pm." *Id*.  He "takes several medications twice a day, 8:00 am and 7:00

pm" and with Patrick's help he shaves on "Sunday's, Tuesday, and Thursday." *Id*.  His meals are consistent: "He eats shake n bake pork chops on Monday, Thursday, and Friday, ravioli on Tuesday; spaghetti marinara on Wednesday; Domino's Pizza on Saturdays and his favorite meal, macaroni and cheese on Sundays." *Id*.  "Every night he talks with either Patrick or [Amy] between 7:00-7:30 pm prior to his shower time.  With notice and planning, Brian will only travel to Florida and will only eat at certain restaurants." *Id*.  Dr. Joshi confirms that Brian "has challenges with changes in routine and caretakers." *Id*. at 15.

A recent event illustrates Brian's difficulty adapting to any change.  On September 10, 2022, Amy "brought Brian to his cousin's high school football game to try to expand what he does daily." Ex. A at 5.  The situation quickly deteriorated.  "Brian tried but the result was, in one word, chaotic.  Brian was anxious, angry, emotionally distraught, and combative." *Id*.  Amy and her sister could not reason or negotiate with Brian.  *Id*.  He only calmed down to get in the car when "Amy called Patrick, and for the next 15 minutes, Brian listened to his dad and Patrick was able to help diffuse his son's emotional state." *Id*. at 5-6.

Patrick is irreplaceable in keeping Brian on track.  They are very close, and Patrick understands his need for rigid routines.  *Id*.  Patrick lives with Brian and Amy and helps Amy manage Brian's constant care.  PSR at ¶ 52.  Amy cannot care for Brian alone or hire help.  Amy requires Patrick to help intervene when Brian becomes aggressive.  Ex. A at 1.  Patrick is "instrumental in diffusing emotional and combative situations; situations that can be set off by merely making the wrong dinner on the wrong night." *Id*.  Any slight deviation "can result in an aggressive reaction from Brian" and requires "real time management." *Id*.  Patrick and Amy must work together to resolve the situation and according to Amy, "it takes the two of us, one cannot do it on their own." *Id*.  Without Patrick, "it is impossible for [Amy] to parent alone." *Id*.  Dr.

Joshi also noted that Brian's condition requires both Amy and Patrick: "Brian, because of his autism and the related social and emotional immaturity and rigidities has parenting needs that are very demanding and require availability of both the parents." *Id*. at 15.

Brian's doctor has also observed Patrick's integral role in Brian's care, the closeness of their relationship, and the positive impact Patrick has on Brian:

> "In my seven years of taking care of Brian as psychiatrist I have observed that Brian's father is very involved in his care and Brian is dependent on him for his day-to-day needs. Brian's father is an integral part of his daily routine and rituals and historically I have observed that Brian has a difficult time when father is unavailable; often leading to worsening of anxiety and mood dysregulation. More recently, as a teenager Brian has increasingly bonded with his father which has further increased his dependency on him." *Id*. at 15.

Because of his disabilities, Brian also needs a caretaker who knows him and who he feels comfortable with. PSR at ¶ 50. Brian is facing several upcoming life changes and Patrick's support is essential to help him navigate those changes. For example, Brian is getting older, which means he is aging out of high school and the care of his longtime pediatrician. *Id*. These changes are difficult for Brian to process given his need for routine and structure. Patrick "plays a major role in Brian's contentedness" and helps him process change. Ex. A at 1.

Many friends and family members have expressed their concern for Brian if Patrick does not maintain the same presence in his life. Amy's sister notes: "Now that Brian is seventeen, and a growing young man, Patrick and Amy support each other when a heightened situation needs to be diffused. This is not part of the job my sister can do alone." *Id*. at 5. She continues: "Patrick leaving for a length of time will undoubtedly have a negative impact on Brian and his home dynamic. My sister needs Patrick's partnership in raising their son. My nephew needs his dad." *Id*. at 6. Patrick's cousin Kimberly echoes the same concern: "I see how important it is for Patrick to be actively present in Brian's day-to-day life. Brian has a very strict regimen, and he does not

do well when that is broken." *Id*. at 7.  Erin, who like Kimberly was a former babysitter for Brian and remains close to the family, explains: "I can't watch Brian go through any traumatic change in his life, its going to be too hard on him." *Id*. at 10.  Another family friend, Lori Garone, agrees: "My hope is that Pat is given the opportunity to continue to be the same integral part of his son's life that he has always been. It's vital to Brian's well being that he maintains the same routine that Pat has worked so hard at for all these years." *Id*. at 13.  Without Patrick in his everyday life, Brian would be "traumatized" and could "regress due to his medical condition." *Id*. at 14, 11.  The Court should avoid this trauma to Brian and sentence Patrick to a period of home confinement.

      B.     *Patrick Suffers from Serious Mental and Physical Issues*

Patrick suffers from a wide variety of complex health issues which require monitoring by his current treating physicians.[2]  Section 3553(a) requires the Court to consider the need for the sentence imposed to provide the defendant with needed medical care in the most effective manner. Courts in this District have taken that mandate seriously and departed downward in several cases where defendants needed ongoing medical treatment. *See e.g., United States v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) (district court did not err in departing downward based on defendant's medical condition); *United States v. Willis*, 322 F. Supp. 2d 76, 76-77 (D. Mass. 2004) (imposing sentence of home confinement so defendant could continue to see his doctors and pursue his course of treatment); *United States v. Baron*, 914 F. Supp. 660, 662-663 (D. Mass. 1995) (departing downward from 27 to 33 months' incarceration to probation with six months' home confinement due to defendant's age and medical condition).  The Court should vary downward so that Patrick can obtain the care he needs from the physicians that have been treating him for his complicated mental and physical conditions for many years.

---

[2] Patrick has provided all medical records to Probation.

As a result of his military service, Patrick has been diagnosed with chronic post-traumatic stress disorder and obsessive compulsive disorder.  PSR ¶ 59.  He has also been diagnosed with insomnia.  PSR ¶ 59.  For these issues Patrick has been prescribed Gabapentin, Amitriptyline, Quetiapine, Clonazepam, and Miratazapine.  PSR at ¶ 59.  Patrick has a long-term psychiatrist, Dr. Landis Mitchner, who has been treating him at the VA hospital for many years.  Patrick sees Dr. Mitchner once per month.  PSR ¶ 59.

Patrick's physical health issues are equally severe.  Patrick has had major issues with his neck and spine.  In 2017 and 2018, Patrick had several injections to help with left-sided neck pain that was affecting his ability to function.  PSR ¶ 54.  In 2018, Patrick was nearly paralyzed after he fell in the middle of the night, hit his head on the corner of his dresser, and broke his neck.  PSR ¶ 55. Patrick's ultimate diagnosis as a result of the accident was central cord syndrome with permanent nerve damages, which causes trembling.  PSR at ¶ 55.  He was discharged to home care and ordered not to drive.  TX 90.  He was readmitted a few days later for surgery where the C5-6 and C6-7 sections of his spinal cord were fused back together, which involved bone grating and plate placement.  TX 90.  He takes Gabapentin for nerve pain.  PSR at ¶ 57; Trial Tr. Day 5 at 108:12-15.  Patrick's diagnoses include incomplete tetraplegia due to lesions at C5-C7, chronic back pain, folliculitis, vulgaris, gastroesophageal reflux disorder, chondromalacia of patella, unspecified gastritis and gastroduodenitis, and lumbago.   PSR at ¶ 55.

Patrick also suffers from debilitating migraines.  They often leave him unable to function. Trial Tr. Day 5 at 48:24-49:3; 79:16-24; 144:8-17.  He manages his migraines with prescriptions for Imitrex and Sumatriptan Succinate, and he also receives Botox injections.  PSR at ¶¶ 56-57. Because these conditions are most effectively managed through Patrick's current providers, the Court should vary downward and sentence him to a period of home confinement.

Patrick has recently been struggling with lingering effects of Covid-19. He suffers from persistent shortness of breath, which his doctors, including a pulmonologist, are monitoring closely. An October 2022 CT scan of Patrick's chest showed abnormalities in his lungs that likely represent pneumonia. Patrick's doctors recommend a follow-up chest CT scan in three months, which has been scheduled for January 30, 2023 along with a follow up appointment to review the results on February 15, 2023. He has been prescribed antibiotics to treat pneumonia, including Augmentin and Azithromycin. Given these issues, a congregate setting like imprisonment puts Patrick at risk of contracting another severe case of Covid-19 with significant complications. A prison sentence also prevents Patrick from monitoring his health issues with his current team of doctors.

## V.   Need for the Sentenced Imposed

Patrick's proposed sentence provides adequate specific and general deterrence. Patrick recognizes how difficult life will be for Amy and Brian if he is incarcerated. Patrick's absence will not only affect Brian's health and wellbeing, but also Amy's ability to parent Brian and provide for herself. PSR ¶ 50. Patrick will not risk putting his family in this position again. Patrick has made restitution to the SSA and will make restitution to the VA on the day of his sentencing. A fine will serve as further punishment. Patrick received notice on June 15, 2022 that the SSA calculated a new overpayment balance in the amount of $281,439.60. Patrick promptly paid the full amount to the SSA via check on July 1, 2022.

Patrick's proposed sentence is also sufficient for general deterrence. His case was not a typical one. He did not falsely claim veteran status. He did not falsely claim a disability. He owned an asset and contributed to it more than was acceptable under VA and SSA regulations. The circumstances of this case are enough to put the general public on notice that the government

- 15 -

will prosecute and seek significant sentences for individuals who improperly receive benefits under any circumstances.  In any event, the certainty of punishment – not the length of it – has been found to be the stronger deterrent effect in white collar cases.  *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-49 (2007); *see also* Michael Tonry, *Purposes and Functions of Sentencing,* 34 CRIME & JUST. 1, 28 (2006).  That deterrent effect is present here with Patrick's proposed sentence.

**VI.     Need to Avoid Unwarranted Sentencing Disparities**

Patrick's proposed sentence is appropriate because it is consistent with sentences imposed in this district for theft of government funds.  Numerous defendants have received non-custodial sentences where the loss amount was in the six-figures.  For example, in *United States v. Moore*, the defendant wrongfully received over $260,000 in benefits after failing to notify the SSA that the intended payee passed away. No. 20-CR-30007-RGS. The applicable Sentencing Guidelines range was 18 to 24 months, and the government requested an 18 month sentence.  ECF No. 42. The defendant was sentenced to six months home confinement and probation.  ECF No. 45. Similarly, in *United States v. Hersey*, the defendant wrongfully received benefits in excess of $440,000 and the applicable Sentencing Guidelines range was 18 to 24 months.  No. 15-CR-10336-LTS at ECF No. 35.  The government recommended a sentence of 18 months, but the Court sentenced the defendant to five months home confinement and probation.  ECF Nos. 11, 34.

Other cases support Patrick's proposed sentence as well:

- In *United States v. Progin*, the defendant wrongfully received over $325,000 in benefits. No. 18-CR-400049-TSH.  The total offense level was 15 and the government requested a sentence

of 18 months.  ECF No. 39.  The defendant was sentenced to time served with a period of supervised release.  ECF No. 44.

- In *United States v. Brunnell*, the defendant wrongfully received over $230,000 in benefits. No. 17-CR-40048-TSH.  The applicable Sentencing Guidelines range was 12 to 18 months.  ECF No. 64.  The Court sentenced the defendant to 60 days in a residential reentry center, three months home confinement, and probation.  ECF No. 63.

- In *United States v. Murphy*, the defendant wrongfully received her mother's disability benefits, totaling over $330,000, for a period of thirty-six years.  She was sentenced to eighteen months home confinement and a fine.  No. 14-CR-10119-PBS at 15.

Defendants who have been convicted of receiving SSA benefits while working have also received non-custodial sentences.  For example, in *United States v. Camara*, the defendant was sentenced to time served with five months home confinement, even though she was in CHC III, for receiving disability benefits while working.  No. 19-CR-10442-IT at ECF No. 75.  She was ordered to pay over $84,000 in restitution and forfeit over $80,000.  *Id.*  In *United States v. Allen*, the defendant was sentenced to four months home confinement and probation for receiving disability benefits while working.  No. 12-CR-30052-MAP at ECF No. 16.

Patrick's proposed sentence is consistent with recent sentences for theft offenses.  In 2021, 30% of defendants nationwide who were convicted of theft were sentenced to probation only, probation and alternatives, or a fine.  U.S.S.C. Statistical Information Packet, Fiscal Year 2021, First Circuit at Table 4.  In the First Circuit, 43.6% of defendants convicted of theft were sentenced to probation only, probation and alternatives, or a fine.  *Id.* at Table 5.  Courts in the First Circuit varied from the Sentencing Guidelines for theft offenses in 49.2% of theft cases.  *Id.* at Table 10.

## **CONCLUSION**

For the foregoing reasons, Patrick Quinn respectfully submits that a sentence of six months' home confinement with the ability to work and attend medical appointments is sufficient but no greater than necessary to effectuate the purposes of 18 U.S.C. § 3553(a).

Dated: November 1, 2022         Respectfully submitted,

PATRICK J. QUINN

By his attorneys,

*/s/ Christina N. Lindberg*
Tracy A. Miner, BBO No. 547137
Christina N. Lindberg, BBO No. 690443
Miner Siddall LLP
101 Federal Street, Suite 650
Boston, Massachusetts 02110
tminer@msdefenders.com
clindberg@msdefenders.com
Tel: (617) 202-5890

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served by ECF on counsel of record for all parties on November 1, 2022.

_/s/ Christina N. Lindberg_
Christina N. Lindberg